UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

GERMAN RIOS DAVILA,                          :

                          Petitioner,        :

        - against -                          :

WILLIAM LEE, Superintendent,                 :

                          Respondent.        :

----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12.30.14

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
LAURA T. SWAIN**[*]

11cv496-LTS-FM

**FRANK MAAS**, United States Magistrate Judge.

Pro se petitioner German Rios Davila ("Davila") brings this habeas corpus

proceeding pursuant to 28 U.S.C. § 2254 to challenge his conviction in Supreme Court,

New York County, on charges of Criminal Possession of a Controlled Substance in the

First and Third Degrees.  Following a jury trial before Justice William A. Wetzel, Davila

was sentenced to concurrent prison terms which amount, in the aggregate, to a sentence of

twenty-three years to life.  Davila is serving that sentence at the Green Haven

Correctional Facility.

        Davila filed his original habeas petition on January 20, 2011.  (ECF No. 1

("Initial Petition" or "Initial Pet.")).  In that Initial Petition, Davila raised five claims,

alleging that his constitutional rights were violated because:

--------------------------------

        [*]      Matthew C. Sommer, a student at the Harvard Law School, provided substantial
assistance in the preparation of this Report and Recommendation.

1. the trial judge's refusal to recuse himself deprived Davila of a fair trial;

2. the trial judge's continual interruptions of testimony with denigrating remarks about the defense and helpful questions for the prosecution deprived Davila of a fair trial;

3. the trial court's preclusion of certain exculpatory photographs denied him the right to present a defense;

4. erroneous jury instructions regarding the prosecution's burden of proof violated his Fourteenth Amendment due process rights; and

5. evidence obtained in violation of his Fourth Amendment rights was improperly received.

(See Initial Pet. ¶ 13).

Additionally, in an amended petition (ECF No. 28 ("Amended Petition" or "Am. Pet.")), Davila asserts that his trial counsel provided ineffective assistance in violation of his Sixth Amendment rights because he failed to advise Davila to accept a "highly favorable" plea offer.  (See Am. Pet. ¶ 13).[1]

For the reasons set forth below, Davila's entire Petition should be denied. Additionally, because Davila has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

---

[1] The Amended Petition does not incorporate Davila's original claims despite my warning that any claims not expressly set forth therein might be deemed abandoned.  (See ECF No. 25).  I nevertheless have addressed the claims raised in Davila's Initial Petition because he is proceeding pro se.  Davila's Initial Petition and Amended Petition hereinafter are referred to, collectively, as his "Petition."

I.    <u>Background</u> [2]

  A.    <u>People's Case</u>

    The People's proof at trial would have permitted a reasonable juror to find as follows:

    On November 30, 2001, Special Agent Mark Manko ("Manko") of the Drug Enforcement Agency ("DEA") was working as a member of the New York Drug Enforcement Task Force.  (T. 2, 3, 6).  While patrolling near the vicinity of 91st Street and 30th Avenue in Queens, New York, Manko observed the driver of a blue Ford Taurus speaking with a woman who had just exited a silver Nissan.  (<u>Id.</u> at 7).  Although Manko did not hear their conversation, he saw the woman point in the direction of a "heavy set Hispanic male" who was walking from Astoria Boulevard toward the Taurus.  That person had a brief conversation with the driver of the Taurus, and eventually entered the vehicle.  (<u>Id.</u>).  A license plate search revealed that the Taurus was registered to Harold Calle ("Calle"), and that a nearby Lexus was registered to Davila.  (<u>Id.</u> at 8, 12, 52-55,

---

[2]    "H." refers to the transcript of various pretrial hearings (ECF No. 16).  "V." refers to the transcript of the voir dire on April 21, 2003 (ECF No. 16).  "T." refers to the trial transcript (ECF Nos. 15, 16).  "S." refers to the transcript of Davila's sentencing (ECF No. 15).  "P." refers to the transcript of a post-conviction hearing on February 22 and May 8, 2013 (ECF No. 26).  "F." refers to the decision by Justice Daniel Fitzgerald following that hearing (<u>Id.</u>).  "Ex." refers to the exhibits annexed to the Declaration of Assistant Attorney General Leilani Rodriguez, dated July 11, 2011 (ECF No. 18).  "Br." refers to Davila's brief on appeal to the Appellate Division, First Department (Ex. E).  "Mem." refers to the memorandum of law attached to Davila's Petition (ECF No. 1).  "Resp't's Mem." refers to the Memorandum of Law in opposition to the Petition (ECF No. 17).

121).  A criminal history check disclosed that Davila's name was in the Narcotics and

Dangerous Drug Information System ("NADDIS") database.  (Id. at 131).

        One week later, on December 7, 2001, Manko spotted Calle's Taurus near

the New Jersey entrance to the Holland Tunnel at around 10:15 a.m.  (Id. at 10-12).

Manko followed the Taurus through the tunnel into Manhattan and then radioed for

backup assistance.  (Id. at 58-59, 63-64, 177, 245, 289, 304, 367).  Manko followed the

Taurus to 91st Street and 30th Avenue in Queens, where he first had seen the vehicle a

week earlier.  Several other DEA agents joined Manko in that area.  (Id. at 13, 59-60).

        The DEA agents observed Davila and Omira Diaz ("Diaz") exit a nearby

home and enter a silver Nissan.  The agents then followed the Nissan which eventually

stopped at a laundromat on Astoria Boulevard.  (Id. at 13-14, 61, 65, 67, 136, 178-79,

214, 245, 247, 261-62).  There, they saw Davila walk in and out of the laundromat several

times while talking on a cell phone.  He later left the laundromat around 11 a.m.  (Id. at

179, 181-83, 214-18, 262).

        Around 11:50 a.m., the agents saw Davila meet with Calle and Jonny Potes

("Potes") at a nearby store.  (Id. at 183-84, 219-22).  After the three men got into Davila's

Lexus, they drove around Queens for the next three hours in an erratic, "zig-zag" manner,

occasionally squaring a block or stopping for no apparent reason, in an effort to detect

surveillance.  (Id. at 24, 248-49, 262-66, 304-06).

        Around 1:47 p.m., the agents saw Davila and Calle enter a store containing

a phone bank on 73rd Street.  Five to ten minutes later, the two exited and walked down

the street to make a call from a pay phone.  (Id. at 17, 19, 253-55, 267-70, 273, 306-7).  A few minutes later, Davila made a call from his cell phone, walked into another store, exited the store and then got back into his Lexus.  (Id.).

Sometime later that afternoon, Davila exited his Lexus at 91st Street and 30th Avenue, and began driving Calle's Taurus.  (Id. at 22-24, 26, 247-48).  Calle and Potes then drove the Lexus.  Around 2:30 p.m., Calle and Potes picked up a man wearing a black leather jacket.  Calle and Potes circled the block and then dropped the man back where they had picked him up just a few minutes earlier.  Calle and Potes continued on their way, and around 3:11 p.m., met inside the Lexus with an unidentified man in a blue jogging suit, who had been standing on Queens Boulevard near Hillside Avenue.  Calle and Potes then drove away.  (Id. at 286, 290-91, 294).

At around 5:15 p.m., the agents followed both vehicles to Davila's house, located at 334 Pennington Street in Elizabeth, New Jersey.  (Id. at 36, 97-8, 187, 276, 308, 325).  Several agents positioned themselves around the home, while another hid behind a parked car in order to observe the house's back entrance.  (Id. at 281, 309, 311).  At around 6 p.m., the suspects exited their vehicles and entered the house.  (Id. at 188, 230, 237, 310-311).  A few minutes later, Davila went outside and moved the Taurus so that its trunk was near the back door of the house.  (Id. at 312, 319, 335-36).  Davila then returned to the house to retrieve a large, red, plastic container, which he placed in the trunk of the Taurus.  (Id. at 313, 343).  After reentering the house, Davila returned with a striped nylon bag, which appeared to contain several heavy, square objects.  Davila also

5

placed that bag into the Taurus' trunk.  (Id.).  He then drove the Taurus away at

approximately 7 p.m.  (Id. at 191, 240, 282-83, 312-13, 319, 343).

   At some point while Davila was moving these objects from the house to the

car, Calle and Potes left the house and drove away in the Lexus.  Davila eventually met

up with Calle and Potes, and then proceeded to a nearby gas station.  The two vehicles

then drove to the Goethals Bridge.  (Id. at 38, 102, 191-92, 283, 372-73, 376).  After the

Taurus passed through the tollbooth, the agents surrounded the Taurus with their patrol

cars.  (Id. at 43, 103, 242, 321-22, 346-47, 379).  Two agents exited their vehicles and

approached the Taurus with their shields fully displayed.  (Id. at 347, 349-50, 354, 380,

386-87).  One agent identified himself in Spanish and told Davila to remain still and to

place his hands in the air.  (Id. at 380, 386).  When Davila asked for an explanation, the

officer directed him to turn off his vehicle and step outside.  (Id. at 388-89, 398).  Once

Davila complied, the agent secured his permission to search the vehicle's trunk.  (Id. at

390-91, 351).

   After Davila opened the trunk, the officers opened the red plastic container

and nylon bag, which contained bricks of white powder wrapped in plastic packaging.

(Id. at 43-44, 104-05, 352-53, 381-82, 395-99).  In total, Davila had been transporting 57

kilograms of cocaine worth more than $1.3 million.  (Id. at 322, 324, 417).  After

discovering the cocaine, the agents placed Davila under arrest.  (Id. at 353, 382, 398, 403).[3]

>  B.  Defense Case

Davila was the only defense witness.  Davila testified that he drove his Lexus to Queens on the morning of December 7, 2001, to spend time with Diaz, who was his girlfriend.  (Id. at 434, 486).  After he arrived at Diaz's apartment, the two drove to a laundromat to do their laundry.  (Id. at 436, 439, 486).  While at the laundromat, Davila met up with his cousin, Calle, and his friend, Potes, who had arrived in Calle's Taurus. (Id. at 434, 436-38).  Davila told Potes that he had some artwork in the trunk of his Lexus, and gave Potes his car keys so that Potes could retrieve it.  (Id. at 437, 491-92).  Calle and Potes then left in the Ford and returned about ten minutes later in Davila's Lexus.  (Id. at 438-39, 488).  Davila and Diaz finished doing their laundry and went to Diaz's apartment for the next two to three hours.  At some point during that time period, Potes parked the Taurus near Diaz's apartment and returned the keys to Davila.  (Id. at 439-40, 486, 492).

Davila testified that around 4 or 4:30 p.m., he drove to his home in New Jersey with Calle and Potes.  (Id. at 446-47, 493).  Once they arrived, Calle and Potes parked both the Taurus and the Lexus behind the house.  (Id. at 448, 493).  Potes then left in the Taurus, and returned about an hour later to pick up Calle.  (Id. at 449-51).

---

[3]     Several agents simultaneously stopped the Lexus and arrested Calle.  (T. 39, 103, 194, 243, 284).

According to Davila, Potes called him later that evening to ask for a favor. (Id. at 449, 495). Davila then drove his Lexus to meet up with Calle, who was driving the Taurus. The two men had a brief conversation and then drove their respective cars toward the Goethals Bridge. (Id. at 451-55). Before reaching the bridge, however, Calle pulled into a gas station and Davila followed. Calle told Davila that the Taurus was making a strange noise, so Davila suggested adding oil to the engine. (Id. at 454-55). Calle followed Davila's advice, but convinced Davila to drive the Taurus from that point forward because Davila knew more about cars than Calle did. (Id.).

As the two cars began to cross the Goethals Bridge, another car suddenly swerved in front of the Taurus. (Id. at 456). According to Davila, an officer walked in front of the Taurus, pointed a gun at him, and began to yell. (Id. at 457-58). Davila told the officer that the Taurus belonged to his cousin. (Id. at 457-58). When the officer requested permission to search the car, Davila responded "of course." (Id. at 458).

Davila testified that he never had seen the contents of the trunk before the officer's search, did not place the nylon bag and red plastic container in the trunk, and had no idea what they contained. (Id. at 460-61, 495, 499, 504). Much to Davila's surprise, the officer opened the bag and container and discovered bricks of cocaine. (Id. at 461, 497).

C.   Suppression Hearing

Prior to trial, Justice Wetzel held a hearing to determine the admissibility of the cocaine recovered from the Taurus and another large quantity of cocaine subsequently

8

recovered from Davila's house.  After the prosecution and defense witnesses testified,

Justice Wetzel denied Davila's motion to suppress the cocaine recovered from the trunk

of the Taurus.  The Justice reasoned that Davila's suspicious behavior gave the officers

probable cause for his arrest, and that no search warrant was necessary because

authorities had "every reason to believe that the instrumentality of the crime . . . was in

the trunk of the car."  (H. 370-71).  In the alternative, the Justice concluded that the

evidence found in the trunk was admissible because Davila had consented to the search.

(Id.).

        In contrast to his determination regarding that cocaine, Justice Wetzel

granted the motion to suppress an additional 43 kilograms of cocaine that had been found

in Davila's home during a post-arrest search.  (Id. at 371-74).  Although Davila's wife

apparently had permitted the officers to search their home, Justice Wetzel found her

consent invalid.  (Id. at 373).  He further opined that even if her consent were valid, it

probably was not broad enough to permit the officers to force open the lock of a closed

room, as they apparently had done.  (Id.).

    D.    <u>Recusal Motion</u>

        Davila was tried twice.  Justice Wetzel also presided at the first trial, which

resulted in a hung jury.  After declaring a mistrial, Justice Wetzel evidently thanked the

jurors in open court for their efforts, but also stated that he would speak with them in the

jury room before releasing them.  (See Ex. X).  According to Davila's trial counsel,

following the latter session, two jurors indicated to him that the Justice "had

expressed . . . his personal opinions about the trial," stating that "he could not understand" how they had failed to convict Davila.  (Br. at 11).  Based on these alleged statements, Davila's counsel asked Justice Wetzel not to preside at the retrial.  (Id.).  The recusal motion was not supported by any affidavits, nor did counsel provide the names of the jurors with whom he allegedly had spoken.  (Ex. X).

On April 21, 2003.  Justice Wetzel Justice Wetzel summarily denied the recusal motion, explaining:

> I've read the papers. I have a vivid recollection of the conversation that took place in the jury room amongst 12 jurors. I'm not going to respond significantly to what was said. I spoke to the jurors. It was a ranging discussion, jurors were very frustrated and expressed a number of opinions in the jury room. None of what occurred in the jury room gives rise to any indication that I have a bias, and I don't.  I gave this defendant a very fair trial the last time and he will receive a very fair trial this time.  All of his rights will be protected.  The fact that this is a strong case is something that I and other Judges are forced to express as time goes on, whether its in the plea negotiations or any other stage.  That does not denote bias.

(Ex. V at 3-4).

E.    Justice Wetzel's Conduct

During the retrial, Justice Wetzel occasionally interrupted the questioning of witnesses to ask questions of his own, clarify points, and generally keep the trial moving.  Unfortunately, some of his comments were less benign than others.  For example, the Justice complained in the jury's presence that some of defense counsel's examinations were "tedious" and continued "on and on."  (T. 63, 230-31).  Similarly,

10

after defense counsel unsuccessfully sought to steer Davila away from statements that
were inadmissible hearsay, the Justice noted that Davila was "not a very good student."
The Justice also cautioned defense counsel that Davila was "rambl[ing]" during his
testimony.  (Id. at 438, 458).  When defense counsel asked the jurors during summation to
hold the prosecution to their burden of proof "on behalf of [Davila] and all he holds near
and dear," Justice Wetzel interjected:  "Near and dear?  We're not interested in the near
and dear."  (Id. at 567).

       Defense counsel never raised any objection to any of Justice Wetzel's
comments during the trial.

       4.    Jury Charge

       In the portion of his jury charge related to the prosecution's burden of
proof, Justice Wetzel instructed the jury as follows:

> [A] reasonable doubt is a doubt which you conscientiously have
> after having used your powers of reason and logic.  For it to be
> reasonable, it must be based upon the nature and the quality of
> the evidence or the lack of evidence, if you conclude that the
> evidence that has been presented is insufficient.  A reasonable
> doubt is an actual doubt for which you can formulate a reason
> based upon logic and analysis. . . .
>
> [W]hen I refer to lack of evidence, . . . I'm not inviting you to
> speculate about what additional evidence[,] were [it] to have
> been presented, may or may not have established. You're not to
> speculate about matters that are not before you.  What I mean by
> a lack of evidence is, if you determine that the evidence which
> the People have offered here fails to establish this defendant's
> guilt beyond a reasonable doubt, . . . you have a lack of
> evidence.  And in that case, you should conclude the People
> haven't met their burden of proof.  On the other hand, if you do

> conclude that the evidence which has been presented convinces you as to the defendant's guilt beyond a reasonable doubt, . . . it doesn't matter what evidence was not presented or what that additional evidence may or may not have proven.

(Id. at 597-98).  The Justice further explained to the jurors that,

> [i]n evaluating the evidence, you should consider its quality, not its quantity.  Under our law, the testimony of even one witness is sufficient to convict if it establishes beyond a reasonable doubt the elements of the crime charged.

(Id. at 600).  Defense counsel did not object to any of these instructions either before or after the charge.

  F.  Verdict and Sentencing

    On April 25, 2003, the jury found Davila guilty of Criminal Possession of a Controlled Substance in the First and Third Degrees.  (Id. at 620-22).  Thereafter, on May 19, 2003, Justice Wetzel sentenced Davila on those two counts to concurrent indeterminate prison terms of, respectively, twenty-three years to life and eight and-one-third to twenty-five years.  (S. 10).

  G.  Resentencing Motion

    On February 22, 2008, Davila moved in state court for resentencing pursuant to the New York Drug Law Reform Act ("DLRA"), which allows a narrow class of defendants serving indeterminate prison terms for drug felonies to seek determinate sentences.  L. 2004, Ch. 735 § 23.  In his papers, Davila highlighted his good behavior in prison and his close family relationships.  (Ex. A).  Davila further contended that there

should be little interest in keeping him in prison since he is a non-citizen who likely will be deported after serving his sentence.  (Id.).

The People opposed the motion, arguing that "substantial justice" required Davila's continued detention since he was the head of a narcotics organization responsible for distributing multiple kilograms of cocaine.  According to the People, Davila's drug-related activity stood to have a substantial impact on the safety of New York citizens.  (Ex. B).

On June 9, 2008, Justice Wetzel denied Davila's resentencing motion.  In the course of reaching his decision, Justice Wetzel observed that the DLRA was not meant to benefit drug "kingpins" like Davila.  (Ex. D).

H.      Direct Appeal

With the assistance of newly-appointed counsel, Davila appealed his conviction to the Appellate Division, First Department.  On appeal, Davila argued that: (1) he was denied his right to a fair trial because Justice Wetzel refused to recuse himself; (2) he was denied his right to a fair trial because Justice Wetzel repeatedly interrupted the trial with denigrating remarks about the defense and posed questions helpful for the prosecution; (3) he was denied his right to present a defense because Justice Wetzel refused to admit certain allegedly exculpatory photographs; and (4) the Justice charged the jury erroneously with respect to the People's burden of proof.  (Ex. E).

In addition, another attorney filed a brief concerning the trial court's denial of Davila's motion for resentencing.  (Ex. F).  The People responded to both appeals in a single brief, (Ex. G), after which Davila filed a single reply, (Ex. H).

On July 21, 2009, after having consolidated the two appeals, the Appellate Division rejected all of Davila's claims other than his resentencing claim, which the court remanded for further consideration.  See People v. Rios-Davilla, 883 N.Y.S.2d 480, 483 (1st Dep't 2009).

In its decision, the Appellate Division first rejected Davila's contention that Justice Wetzel should have recused himself.  Id. at 482.  The court noted that Davila had not provided any affidavits from the jurors at the first trial, nor had he shown that Justice Wetzel did anything more than express an opinion as to the strength of the prosecution's case, based on information that the Justice had learned in the course of the prior proceedings.  The court therefore found no basis to second-guess Justice Wetzel's exercise of his discretion regarding the recusal motion.

Next, the court rejected Davila's claim that Justice Wetzel had intervened improperly during witness testimony and had denigrated defense counsel in the presence of the jurors.  In reaching this conclusion, the court first noted that Davila had not objected to any of these alleged occurrences on the record and, therefore, had failed to preserve these arguments for appeal.  In the alternative, the court found that the claims lacked merit.  Although the court acknowledged that some of Justice Wetzel's comments

were "inappropriate," it nevertheless found that they were not "so egregious as to deprive [Davila] of a fair trial." Id.

The court similarly rejected as unpreserved Davila's constitutional claim regarding the trial court's refusal to admit certain photographs into evidence.  In an "alternative" holding, the court also rejected this claim on its merits, although it did not explain why it did so.  To the extent that Davila's claims concerning the photographs rested on state law grounds, the court found that any error in excluding the photographs was harmless given the "overwhelming evidence of [Davila's] guilt and the photographs' limited probative value." Id. at 483.

The Appellate Division further held that Justice Wetzel's jury charge regarding reasonable doubt, taken as a whole, did not misstate the People's burden of proof or contain any errors of constitutional dimensions.  Id.

Although the Appellate Division denied each of Davila's challenges relating to the conduct of his trial, it granted a remand with respect to the resentencing issue because Justice Wetzel erroneously had believed that the volume of drugs in Davila's possession alone rendered him ineligible for resentencing under the DLRA.  As the court explained, every A-1 felon is eligible to apply for resentencing under the statute. Accordingly, it was error for Justice Wetzel not to have considered Davila's prison record and degree of remorse when deciding the motion.  The court therefore instructed the trial court to exercise its discretion on remand to determine whether "substantial justice required denial of the application." Id. (internal quotation marks omitted.).  On remand,

15

Davila's application was heard by Justice Michael Melkonian, who again denied Davila's request for a sentence reduction.  (Ex. Q).

On September 23, 2010, Davila appealed the denial of his DLRA motion. (Ex. R).  On May 5, 2011, the Appellate Division affirmed Justice Melkonian's ruling, agreeing that the "seriousness of [Davila's] conduct outweigh[ed] the mitigating factors he cite[d]."  People v. Rios-Davila, 922 N.Y.S.2d 361 (1st Dep't 2011).  On May 25, 2011, Davila sought leave to appeal to the New York Court of Appeals.  (Ex. V).  On September 13, 2011, the Court of Appeals denied Davila's application for leave to appeal. People v. Rios-Davilla, 17 N.Y.3d 861 (2011).

I.      Motion to Vacate Judgment

On July 24, 2012, Davila filed a motion seeking to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL").  (ECF No. 33).  In that motion, Davila alleged that his initial attorney, Robert Race, Esq. ("Mr. Race"), provided ineffective assistance because he failed to inform Davila of the desirability of accepting a proposed plea deal that would have resulted in a prison sentence of ten years to life.  (Id. at 2).[4]

---

[4]      Davila filed his CPL § 440.10 motion after he already had filed his Initial Petition in this District.  On October 23, 2012, I stayed further proceedings in this matter during the pendency of that motion.  (ECF No. 25).  I further granted Davila thirty days to amend his Initial Petition following the final disposition of the motion.  (Id.).

On February 22 and May 8, 2013, Justice Daniel Fitzgerald held an evidentiary hearing pursuant to <u>Lafler v. Cooper</u>, 132 S. Ct. 1376 (2012), regarding Davila's ineffective assistance of counsel claim.  At the hearing, Davila admitted that Justice Wetzel had mentioned the proposed plea deal during a pretrial conference that Davila attended.[5]  (P. 16, 21-22).  Davila nonetheless contended that Mr. Race was ineffective because he did not discuss that deal with him.  (<u>Id.</u> at 13, 17).  Davila further maintained that he would have accepted the plea deal if Mr. Race had advised him to do so.  (<u>Id.</u> at 38-40).

Mr. Race, on the other hand, testified that he discussed the proposed plea deal with Davila on multiple occasions, and had recommended that it be accepted, explaining to Davila that "if you lose before Judge Wetzel, knowing him as I do, he's going to give you the maximum of [twenty-five years in prison]."  (<u>Id.</u> at 50).  Indeed, Mr. Race stated that he told Davila that he thought the case against him was strong. Davila continued to proclaim his innocence, however, and hired a different attorney to represent him at trial.  (<u>Id.</u> at 50-51).

On June 5, 2013, Justice Fitzgerald denied Davila's CPL § 440.10 motion. In a fourteen-page decision applying the two-part ineffective assistance of counsel standard of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Justice found, with respect to the reasonableness prong, that Mr. Race "not only conveyed the offer to [Davila], but strongly urged [him] to take it."  (F. 7).  As the Justice explained, Davila's

---

[5]        Mr. Race evidently was not present at this conference.  (<u>See</u> P. 1-2).

hearing testimony to the contrary was "incredible" because he testified that Mr. Race never discussed a plea offer with him, yet had complained in his pro se motion papers only that Mr. Race had failed to "vigorously advise him to take the offer." (Id. at 10) (quotation marks omitted)).  Turning to the prejudice prong of Davila's claim, Justice Fitzgerald found that even if counsel failed to convey the offer, Davila would not have accepted it since (a) he told Mr. Race he wanted a trial because he was innocent; (b) when Mr. Race recommended a guilty plea, Davila hired new counsel to try the case; (c) during both the first and second trials, Davila consistently maintained his innocence; (d) after the second trial, Davila continued to assert his innocence during his probation interview; (e) at the sentencing, Davila's second attorney, David Segal, Esq., noted that Davila had testified and "still maintain[ed] the story that he said from the witness stand;" and (f) even at the Lafler hearing, Davila contended that he was innocent.[6]  (Id. at 11-13).

J.    Habeas Petition

Davila's Initial Petition, dated October 25, 2010, was assigned to Your Honor on January 20, 2011.  (See ECF No. 1).  In that Initial Petition, Davila claimed that his constitutional rights were violated because the trial judge (1) refused to recuse himself in violation of his right to a fair trial; (2) continually interrupted testimony with denigrating remarks about the defense and posed questions helpful for the prosecution in

---

[6]    Justice Fitzgerald also concluded that Davila's ineffectiveness claim was procedurally barred because Davila could have, but had not, raised the issue as part of his direct appeal.  (Id. at 13-14) (citing CPL § 440.10(2)(c)).  Contrary to this assertion, there does not appear to be anything in the trial record that would have permitted Davila to raise the issue at that stage.

violation of his right to a fair trial; (3) precluded certain exculpatory photographs in violation of his right to present a defense; (4) gave erroneous instructions to the jury regarding the prosecution's burden of proof, in violation of his Fourteenth Amendment due process rights; and (5) improperly allowed the prosecution to elicit testimony concerning evidence obtained in violation of his Fourth Amendment rights.  (Initial Pet. ¶ 13).

On March 1, 2011, Your Honor referred the Intial Petition to me for a Report and Recommendation.  (ECF No. 9).  As noted previously, I thereafter granted Davila's application to stay these proceedings pending the resolution of his CPL § 440.10 motion in state court.  I further directed Davila to provide the Court with a copy of any decision concerning that motion within ten days after he received it, and that he file an amended petition incorporating his ineffective assistance claim within thirty days after the conclusion of the state court proceedings.  (ECF No. 25).

Davila's subsequent filings confirm that Justice Fitzgerald denied his CPL § 440.10 motion on June 5, 2013.  (ECF No. 26).  Thereafter, on August 15, 2013, the Appellate Division denied Davila's application to appeal from that decision.  (ECF No. 27).  Davila then filed his Amended Petition incorporating his ineffective assistance of counsel claim on October 25, 2013.  (ECF No. 28).

II.   <u>Discussion</u>

A.   <u>Standard of Review</u>

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application of</u>, clearly established [f]ederal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000), the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  "Under the 'contrary to' clause, a federal

habeas court may grant the writ if the state court arrives at a conclusion opposite to that

reached by [the Supreme] Court on a question of law or if the state court decides a case

differently than [the] Court has on a set of materially indistinguishable facts." Williams

v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a

federal habeas court "may grant the writ if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts." Id. at 413.  This standard does not require that reasonable jurists

all would agree that the state court was wrong. Id. at 409-10.  Rather, the standard "falls

somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"

Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

 The standard set forth in Section 2254(d)(1) is "difficult to meet" for at

least two reasons. White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v.

Lancaster, 133 S. Ct. 1781, 1786 (2013)).  First, the term "clearly established Federal

law" applies only to "the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions." Id. (quoting Howes v. Fields, 132 S. Ct. 1181, 1187 (2012)).  Second,

because "an 'unreasonable application of' those holdings must be 'objectively

unreasonable,' not merely wrong[,] even 'clear error' will not suffice." Id. (quoting

Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).  Thus, "[a]s a condition for obtaining

habeas corpus from a federal court, a state prisoner must show that the state court's ruling

on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for

21

fairminded disagreement."  Id. (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011)) (internal quotation marks omitted).

Section 2254(d)(2) further authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  However, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  Id. § 2254(e)(1).

Although Section 2254 imposes a highly deferential standard of review, it does not require blind deference to every state court decision.  "If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.  Procedural Default and Exhaustion

1.  Applicable Law

a.  Procedural Default

A federal court generally is precluded from reviewing a habeas claim if the state court's prior denial of that claim rests on an adequate and independent state ground. See, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81

22

(1971).  A petitioner's failure to comply with a state procedural rule qualifies as such an adequate and independent state ground, provided that (i) the state court actually "relied on the procedural bar as an independent basis for its disposition of the case," Harris, 489 U.S. at 261-62 (internal quotation marks and citation omitted), and (ii) the state procedural rule is "firmly established and regularly followed."  See Cotto v. Herbert, 331 F.3d 217, 239-40 (2d Cir. 2003).  A state court's express reliance on a procedural ground as one basis for the denial of the claim precludes habeas review, even if the state court proceeds to consider the merits of the claim.  Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).  In determining whether to deny a habeas claim on that basis, however, federal courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'"  Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Stinson, 229 F.3d at 118).

        Federal review of a procedurally-defaulted claim is prohibited unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn, 98 F.3d at 724.  To establish cause for a procedural default, a petitioner must adduce "some objective factor external to the defense" that explains why he did not previously raise the claim.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  To show prejudice, a petitioner must

23

demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness.  Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999). Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).  As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence."  Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Sawyer v. Whitley, 505 U.S. 333, 339 (1992)).  A claim of actual innocence therefore must be supported by "new reliable evidence."  Schlup v. Delo, 513 U.S. 298, 324 (1995).  For this reason, "claims of actual innocence are rarely successful." Id.

b.    Exhaustion

In addition to the barriers posed by the procedural default doctrine, a habeas petitioner must show that he has exhausted all of his available state court remedies, or that there was an absence of state corrective process, or that circumstances rendered that process ineffective to protect his rights.  See 28 U.S.C. § 2254(b)(1)(A)-(B).  As a defendant charged with crimes in New York State court, Davila unquestionably had an effective process available to him through the existing state statutes governing appeals and collateral challenges in criminal cases.  See CPL §§ 440.10 (motion to vacate judgment), 440.20 (motion to set aside sentence), 450.10 (direct appeal to Appellate Division as of right), 450.15 (discretionary appeal to Appellate Division from denial of

motion to vacate judgment), 450.90 (discretionary appeal to Court of Appeals from adverse Appellate Division ruling).  Davila thus must have exhausted each of his federal claims in state court to proceed with them in this Court.

        To satisfy the exhaustion requirement with respect to a particular federal claim, Davila must show that he "fairly present[ed]" that claim "in each appropriate state court (including a state supreme court with powers of discretionary review)."  Baldwin v. Reese, 541 U.S. 27, 29 (2004).  In New York, those "appropriate" state courts are the Appellate Division and the Court of Appeals.  Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005).

        A federal court may "deem" an otherwise unexhausted claim to be exhausted if it would be procedurally barred in the state court in which the petitioner would be required to present the claim.  Coleman, 501 U.S. at 735 n.1; Aparicio, 269 F.3d at 90.  In that circumstance, although the petitioner technically will have satisfied the exhaustion requirement, he also will have procedurally defaulted his claim, thus preventing the federal court from reaching the claim's merits, unless, once again, the petitioner can show either cause for the default and resulting prejudice, or actual innocence.  See Sweet v. Bennett, 353 F.3d 135, 139, 141 (2d Cir. 2003).

        When faced with an unexhausted claim, a federal habeas court may, in certain circumstances, order a stay to allow the petitioner to exhaust the claim in state court.  See Rhines v. Weber, 544 U.S. 269, 277 (2005); Zarvela v. Artuz, 254 F.3d 374, 381-82 (2d Cir. 2001).  "[S]tay and abeyance is only appropriate when the district court

determines there was good cause for the petitioner's failure to exhaust his claims first in state court.  Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Rhines, 544 U.S. at 277.  Federal courts thus have the power to deny unexhausted claims on their merits.  28 U.S.C. § 2254(b)(2).

> 2.      Application of Law to Facts

Several of Davila's claims were rejected by the Appellate Division because Davila's trial counsel failed to preserve them below.  Specifically, Davila's counsel failed to object on the grounds that the trial court had (i) improperly intervened during witness testimony and denigrated defense counsel in the presence of the jury; and (ii) deprived Davila of his constitutional right to present a defense by refusing to admit certain photographs.  Defense counsel's failure to make timely specific objections with respect to these concerns constituted an adequate and independent state ground for denying these claims on direct appeal.  See Fernandez v. Leonardo, 931 F.2d 214, 216 (2d Cir. 1991) (relying on failure to object at trial as the basis for a procedural default under New York law); Peterson v. Scully, 896 F.2d 661, 663 (2d Cir. 1990) ("If a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with . . . a 'contemporaneous objection' rule, a federal court generally may not consider the merits of the constitutional claim on habeas corpus review.").

Additionally, Davila's Fourth Amendment claims are unexhausted because he did not raise them on direct appeal or in any state post-conviction proceedings.  In all likelihood, Davila also would now be precluded from presenting these claims in collateral proceedings, since he could have raised them on direct appeal yet failed to do so.  In these circumstances, these unexhausted claims are procedurally barred.

Davila therefore is not entitled to habeas review of any of his procedurally defaulted or unexhausted claims unless he can show cause and prejudice, or that refusal to review the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  In his papers, Davila has failed to demonstrate any excusable cause for his failure to raise his claims properly in state court.  To be sure, Davila does assert that the "failure to consider these claims will result in a fundamental miscarriage of justice."  (Mem. at 31).  His conclusory allegations to that effect are not enough, however, to overcome his failure to perfect his claims in state court.  See, e.g., Perez v. Greiner, No. 00 Civ. 5504 (RCC) (KNF), 2005 WL 613183, at *7 (S.D.N.Y. Mar. 14, 2005) (rejecting claim of actual innocence based solely on petitioner's conclusory statement); Zelaya v. Mantello, No. 00 Civ. 0865 (MBM), 2003 WL 22097510, at *6 (S.D.N.Y. Sept.10, 2003) (same).

Consequently, Davila's procedurally defaulted and unexhausted claims are not subject to habeas review.

C.    Merits of Davila's Claims

Although a federal judge reviewing a habeas petition need only consider claims that are fully exhausted and not procedurally defaulted, it is understandable that someone such as Davila, who is serving a lengthy sentence, would wish to have the merits of his claims addressed.  Moreover, there is always the possibility that an appellate court might reach a different conclusion concerning these threshold issues.  For these reasons, I have considered each of Davila's claims on the merits in this Report and Recommendation.  As set forth below, despite this accommodation, none of Davila's claims warrants the relief he seeks.

1.    Recusal

Davila first contends that he was denied the right to a fair trial as a consequence of Justice Wetzel's refusal to recuse himself after he had a conversation with the jurors involved in Davila's first trial.  (Mem. at 4).  On direct appeal, the Appellate Division rejected this claim, concluding that Justice Wetzel had exercised his discretion properly.  As the court explained, Davila contended that Justice Wetzel had expressed the opinion that Davila should have been found guilty.  Rios-Davilla, 883 N.Y.S.2d at 482. Since Davila failed to submit any admissible proof that this had occurred, the court found no basis to believe that Justice Wetzel's "impartiality might reasonably be questioned, or . . . that [he] had any other ethical obligation to grant the recusal motion."  Id. Accordingly, the court accepted Justice Wetzel's representation that he simply had

expressed an his "opinion on the strength of the People's case . . . formed through information . . . learned while presiding over the proceedings." Id.

As the Supreme Court has noted, matters relating to judicial recusal rarely "rise to a constitutional level." FTC v. Cement Institute, 333 U.S. 683, 702 (1948). Indeed, "due process requires . . . recusal of a judge only in the most extreme cases of demonstrated bias or prejudice." Curkendall v. Mazzuca, No. 05 Civ. 688S, 2008 WL 3851820, at *22 (W.D.N.Y. Aug. 15, 2008) (citing Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-22 (1986)). In circumstances akin to those alleged here, disqualification is required by the United States Constitution only if the judge's bias "stem[s] from an extrajudicial source and result[s] in an opinion on the merits on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 583 (1966). Consequently, if the judge's personal opinion arises from information gathered during the course of adjudicatory proceedings, recusal is not mandated. Id.

To prevail on his recusal claim, Davila therefore must show that Justice Wetzel's alleged bias stemmed from an extrajudicial source. Davila has failed to provide any such evidence. Prior to the second trial, Davila's counsel suggested that several jurors had told him after the first trial that Justice Wetzel "expressed to the panel his personal opinions," including his inability to "understand how the panel could not convict," and that he had been "critical of the jurors who voted not guilty." (Br. at 17). These assertions, however, were plainly hearsay. Moreover, even if Justice Wetzel made

the statements alleged, there still has been no showing that he relied upon any knowledge that was not derived from matters occurring in court.  It follows that Davila cannot establish that his constitutional right to a fair trial was infringed by Justice Wetzel's decision to preside at the second trial.

2. Judicial Misconduct

Davila next contends that Justice Wetzel disparaged the defense in the jury's presence and improperly asked witnesses questions that helped the prosecutor, thereby violating Davila's due process right to a fair trial.  (Mem. at 4-13).  The Appellate Division found that Davila failed to preserve these claims, but also held, in the alternative, that Justice Wetzel's intervention was "not so egregious as to deprive [Davila] of a fair trial."  Rios-Davila, 883 N.Y.S.2d at 482.

In certain circumstances, "prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause."  Daye v. Attorney General of New York, 712 F.2d 1566, 1570 (2d Cir. 1983). Nevertheless, as courts in this Circuit have recognized, "[j]udicial intervention in the course of a criminal trial 'would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.'"  Perez v. Hollins, No. 02 Civ. 6120 (GBD) (JCF), 2004 WL 307271, at *10 (S.D.N.Y. 2004) (quoting Daye, 712 F.2d at 1572).  In determining whether a defendant received a fair trial despite the trial court's intervention, a reviewing court must consider

whether (a) the trial judge's interference "distract[ed] the jury from a conscientious discharge of their responsibilit[y] to find the facts, apply the law, and reach a fair verdict," and (b) "the overall conduct of the trial [was] such that public confidence in the impartial administration of justice was seriously at risk." Daye, 712 F.2d at 1572.

The specific examples of improper judicial intervention cited by Davila were not so clearly adverse to him that he was denied a fair trial. Most of Justice Wetzel's comments and questions, although admittedly sometimes a bit hostile in tone, seemed intended either to clarify the testimony or to move the trial along at a reasonable pace. For example, Justice Wetzel occasionally interrupted defense counsel's direct and cross-examinations simply to ask a witness to repeat his testimony or to provide additional contextual information. (See, e.g., T. 64 ("You mentioned the sergeant?"), 76 ("What do you observe?"), 227-28 ("Left to right? Where was your car? To the left?")). At other times, Justice Wetzel instructed counsel not to repeat the same question and to move to a new line of questioning when a subject already had been covered at length. (See, e.g., id. at 111 ("Continue unless you're finished."), 230 ("We've covered this. . . . [D]on't ask the question again."), 478 ("Okay. Next question.")). On the whole, these comments were not likely to have undermined public confidence in the impartiality of the judicial system, nor were they sufficiently disparaging to distract the jury from their role as unbiased fact-finders.

Indeed, the Justice also interjected himself into the proceedings in the very same manner during the prosecutor's witness examinations. (See, e.g., id. at 6 ("All right,

why don't we go from the universal to the particular[?],"), 260 ("All right.  Hold on.
We're looking for some new information now.")).  Justice Wetzel also sustained
numerous defense objetions and overruled prosecutorial objections.  (See, e.g., id. at 41,
63, 114, 128, 213, 402, 480-81, 500, 508).  Similarly, when the People sought to
introduce photographs of Davila's home to underscore agent Clancy's ability to see
Davila loading drugs into the trunk of his car, the Justice himself drew the agent's
attention to the differences in the lighting conditions before limiting the use of the
photographs to the issues of "the size of [Davila's] property" and the "structure" of his
house.  (See id. at 39-42) ("But when you were observing that evening, the lighting
wasn't as it is there. . . . [I]s that correct?").

        Perhaps the best indication that Justice Wetzel did not display a bias against
Davila and his counsel that made a fair trial impossible is Davila's trial counsel's
consistent failure to object to the conduct that Davila now contends somehow improperly
tipped the scales against him.  Davila's counsel was, to put it mildly, no shrinking violet.
For example, during the trial, when Justice Wetzel indicated that he did not wish to
entertain an oral application at the end of a trial day, defense counsel responded, "You
know Judge, that motion I made for the recusal is the right motion.  It was the right
motion. . . . It should  have been granted."  (Id. at 143-44).  The following day, when
counsel's application was heard, Judge Wetzel stated, "You don't have the right to . . .
make another personal attack on me," to which counsel responded, "I'm not.  I want to
protect my record, Judge.  That's all I want to do."  (Id. at 149) (emphasis added).

There were other similar instances in which Davila's counsel forcefully complained about perceived injustices.  (See, e.g., id. at 147-49, 153, 327, 348-49, 391-92, 393-94).  Nevertheless, despite his combative manner, and expressed desire to make an adequate record, Davila's counsel failed to preserve his arguments concerning the fairness of the trial.  The fact that Davila's counsel failed to object to the instances of alleged judicial misconduct upon which Davila now relies confirms that Justice Wetzel's actions and statements lacked the powerful prejudicial impact that Davila now belatedly seeks to assign to them.  See United States v. Camniff, 521 F.2d 565, 572 (2d Cir. 1975) ("The failure to object not only precludes our consideration . . . on appeal, . . . but indicates counsel's own difficulty in finding any prejudice.").

In any event, even if Justice Wetzel's intervention did exceed permissible bounds, Davila's claim still would be subject to harmless error analysis.  Thus, Davila cannot obtain habeas relief unless the challenged error is shown to have "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  The Second Circuit has held that the burden of proving such a "substantial and injurious effect or influence" rests with the petitioner, rather than the State.  Bentley v. Scully, 41 F.3d 818, 824 (1994).

Here, apart from conclusory allegations, Davila has not presented any evidence to suggest that Justice Wetzel's conduct prejudicially affected the jury's verdict.  Moreover, the prosecution presented overwhelming evidence of Davila's guilt, including

his use of multiple telephones and evasive driving habits on the date of his arrest,

Clancy's testimony that he saw Davila loading containers of cocaine into the trunk of his

vehicle, the seizure of the cocaine from the Taurus, and Davila's false testimony that he

had not placed it there.  In light of this evidence, there is no reason to believe that the jury

based its verdict on anything other than the strength of the People's case.  Accordingly,

because Davila has not met his burden by establishing a substantial and injurious effect,

he is not entitled to habeas relief with respect to his judicial intervention claim.

### 3.    Exclusion of Photographs

Davila further maintains that he is entitled to habeas relief because the trial

court improperly excluded two photographs of the backyard where Davila had been seen

loading containers of cocaine into the trunk of a car.  Davila contends that the proffered

photographs would have shown how dark the backyard was, thereby suggesting that

Clancy could not have seen that which he claimed to have seen.  (Mem. at 15-18).  In his

view, the failure to receive this evidence denied him of his constitutional right to present a

defense at trial.

Davila first attempted to introduce the photographs in question during the

cross-examination of Clancy, who claimed to have seen Davila loading the cocaine into

the Taurus.  When counsel asked whether the first of the photographs was a "fair and

accurate" representation of the yard as it appeared on the day of Davila's arrest, however,

Clancy was unable to confirm that it was, stating that the lighting conditions differed.  (T.

345).  As a consequence, counsel never sought to proffer the photographs through Clancy. (Id. at 346).

        After Clancy completed his testimony, Davila's counsel requested that he remain available so that he later could be confronted with his testimony during Davila's first trial.  Counsel represented that Clancy previously had testified that the photographs were a fair and accurate representation of the backyard as it appeared at the time of Davila's arrest.  (Id. at 363-64).  Counsel argued that he had been blindsided by Clancy's changed testimony and therefore did not have available the excerpt from the prior trial transcript necessary for impeachment purposes.  (Id. at 363).

        The following day, Justice Wetzel noted that he would have been inclined to permit further questioning of Clancy had his prior testimony been shown to be inconsistent.  Having reviewed the transcript, however, the Justice concluded that Clancy previously had acknowledged that the photographs accurately depicted the "configuration of the house," but not that the lighting conditions were the same.  (Id. at 407) (noting that "there is nothing in the prior statement that is inconsistent").  Significantly, during the second trial, the jury already had seen other pictures showing the layout of the backyard area, rendering the photographs that counsel proposed to introduce through Clancy cumulative – except with respect to the lighting conditions.  Justice Wetzel indicated that he therefore would not receive the photographs unless Davila could establish that the lighting conditions depicted were the same as those existing at the time of Clancy's observations.  (Id. at 407-08).

Despite having been given this road map, Davila's counsel neither asked further questions about the photographs during the prosecution's case-in-chief, nor attempted to introduce the photographs during Davila's direct examination. After Davila's direct examination concluded and the court had taken a recess, however, defense counsel asked to reopen Davila's direct testimony so that he could lay a foundation that the pictures were fair and accurate representations of the lighting conditions during the evening hours outside of Davila's home. (Id. at 464). Justice Weltzel denied that application, as well as a renewed application to introduce the photographs on re-direct examination, reasoning that Davila could not testify to the lighting conditions observed by Clancy. (Id. at 465, 505).

Although due process requires that a criminal defendant be afforded the right to present admissible evidence that might influence the jury's determination, that "does not give criminal defendants carte blanche to circumvent the rules of evidence." United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992). Courts consequently have the power to exclude evidence through the application of evidentiary rules, provided that those rules serve "legitimate interests in the criminal trial process and are not arbitrary or disproportionate to the purposes they are designed to serve." Id. (quoting Rock v. Arkansas, 483 U.S. 44, 55-56 (1987)).

Under New York law, the proponent of photographic evidence must demonstrate that it fairly and accurately depicts that which it purports to represent. See People v. Byrnes, 33 N.Y.2d 343, 347 (1974); People v. Brown, 582 N.Y.S.2d 461, 462

(2d Dep't 1992).  When photographs are offered to show what would have been visible to a particular witness, the party seeking their introduction bears the burden of showing that the photographs "were taken under the same lighting conditions and from the same angle of view" that the witness observed.  People v. Mixon, 611 N.Y.S.2d 723, 725 (4th Dep't 1994).  Although "any person having the requisite knowledge of the facts" may lay this foundation, Brown, 582 N.Y.S.2d at 462, the ultimate question of whether evidence should be received rests with the trial judge.  Wesler v. Kassl, 485 N.Y.S.2d 844, 845 (2d Dep't 1985).

During the second trial, Clancy was unable to confirm that the photographs of the backyard shown to him by Davila's counsel accurately reflected the lighting conditions at the time he observed Davila loading the cocaine into the Taurus.  Moreover, Justice Wetzel found that Clancy had not previously admitted during his testimony at the first trial that those photographs accurately depicted those conditions.  It therefore was reasonable for Justice Wetzel to conclude that Clancy was not a witness through whom Davila could establish that the photographs accurately reflected what the lighting was like at the time Clancy made his observations.

The correctness of Justice Wetzel's rulings concerning defense counsel's attempt to introduce the photographs through Davila is less clear.  Significantly, Justice Wetzel did not reject the attempt to lay a foundation for the admission of the photographs through Davila on the grounds that they were untimely.  Rather, the Justice reasoned that the:

> only relevance of those pictures is what the lighting was.  The
> defendant knows nothing.  He would just say he's been in the
> backyard.  To him that's the light.

(T. 465).  Davila, however, had lived at the location for more than one year and

presumably was familiar with conditions in his own backyard.  (Id. at 428).  Since Clancy

testified that he observed Davila placing the containers into the trunk a little while after

Clancy first had entered the backyard at approximately 6 p.m., Davila conceivably could

have testified that the photographs accurately reflected what the lighting conditions there

were at that time on a date in early December.  If so, Davila likely could have laid an

adequate foundation for the admission of the photographs.  It follows that the decision to

reject defense counsel's proffer on grounds other than untimeliness may well have been

erroneous.

   The Appellate Division held, however, that "[a]ny error in precluding

[Davila] from laying a foundation for the introduction of [the] phtographs was harmless

in view of the overwhelming evidence of [his] guilt and the photographs' limited

probative value."  Rios-Davilla, 883 N.Y.S.2d at 483.  Indeed, even without the

photographs, the jury certainly was aware that Clancy's observations in early December

had been made after sundown.  Clancy himself similarly admitted that it was "dark" in the

backyard.  (T. 311, 345); see also id. at 98 (agent Manko agreeing that it was "dark at that

hour").  Clancy testified that there was a motion-activated sensor light on the back of

Davila's house which enabled him to see at least some of what was occurring, (see id. at

311-12 (noting that the sensor light went on at least twice), 334 (noting that the sensor

light went on when Davila opened the back door), but conceded that he was unable to recall whether the light was on when Davila backed the Taurus closer to the house before loading the containers into its trunk.  (Id. at 336).  In light of all this testimony concerning lighting conditions, Davila cannot show that the Appellate Division applied clearly established federal law unreasonably in the course of concluding that any error with resepct to counsel's proffer of the photographs was harmless.

Davila's claim related to the preclusion of the photographs consequently does not entitle him to habeas relief.

4.    Allegedly Erroneous Jury Charge

Davila further contends that the trial court delivered an erroneous jury charge concerning reasonable doubt, thereby depriving him of his due process rights.  In his brief on appeal, Davila cited three alleged errors in the trial court's instructions.  First, Davila contended that the instructions confused the jury because they "erroneously changed 'lack of evidence' from a cause for finding reasonable doubt, to a result of finding no reasonable doubt."  (Br. 55-56 (emphasis in original)).  Second, Davila maintained that the instructions were unbalanced because they indicated that the testimony of even one witness would be sufficient to convict, but did not further instruct the jury that the testimony of even one witness would be sufficient to acquit.  (Id. at 56-59).  Third, Davila asserted that the instructions failed to explain to the jury that the prosecution had the burden to prove beyond a reasonable doubt that it was Davila, and not someone else, who committed the offenses charged.  (Id. at 59-62).  The Appellate

39

Division rejected these claims, concluding that Justice Wetzel's instructions, viewed as a whole, properly communicated to the jury the concept of reasonable doubt.  Rios-Davilla, 883 N.Y.S.2d at 483.

Due Process requires that a defendant in a criminal case be convicted "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  When evaluating the constitutionality of a jury instruction, such as a reasonable doubt instruction, the court must examine the charge in its entirety.  Cupp v. Naughten, 414 U.S. 141, 146-47 (1991).  The Constitution does not require any particular set of instructions concerning the prosecution's burden of proof, but merely requires that, "taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury."  Victor v. Nebraska, 511 U.S. 1, 5 (1994) (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).  In other words, the reviewing court must determine whether there is "a reasonable likelihood that the jury understood the instructions to allow a conviction based on proof insufficient to meet the Winship standard."  Victor, 511 U.S. at 6.  Habeas relief is warranted only when "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147).

Viewed as a whole, Justice Wetzel's charge properly communicated the concept of reasonable doubt to the jury.  Justice Wetzel began by expressly stating that Davila was entitled to a "presumption of innocence" and that the burden of proof "starts

40

and ends with the People." (T. 596). The charge also made clear that Davila was "entitled to every inference in his favor." (Id. at 599-600). Indeed, Justice Wetzel instructed the jury that reasonable doubt could be based on "the lack of evidence, if you conclude that the evidence that has been presented is insufficient." (Id. at 597). The Justice also advised the jurors that a reasonable doubt is one that is "rooted in reason and based upon an evaluation of the evidence or lack thereof." (Id. at 598). These instructions were properly balanced and did not misstate the prosecution's burden of proof. The Appellate Division's rejection of Davila's jury charge claims thus was neither contrary to, nor an unreasonable application of, clearly established federal law.

>           5.    Fourth Amendment Claims

Davila also claims that his Fourth Amendment rights were violated because the evidence related to the discovery of cocaine in the trunk of his car should have been suppressed. It is well established, however, that "federal habeas corpus relief is not available on the ground that evidence produced at trial was the result of an unconstitutional search and seizure, unless the state denied the prisoner an opportunity for full and fair litigation of the claim." Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991) (citing Stone v. Powell, 428 U.S. 465 (1976)). Thus, a Fourth Amendment claim can provide the basis for habeas relief only when (1) the state has provided no corrective procedures to redress the alleged Fourth Amendment violations, or (2) there is a corrective mechanism, but the defendant was unable to use it because of an "unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67,

70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc)).

      The State of New York unquestionably has provided defendants such as Davila with the necessary corrective procedures through CPL § 710.  See Capellan, 975 F.2d at 70 n.1 ("[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [CPL] § 710.10 . . . , as being facially adequate.") (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)); Vega v. Artuz, No. 97 Civ. 3775 (LTS) (JCF), 2002 WL 252764, at *12 (S.D.N.Y. Feb. 20, 2002). Therefore, in order to secure habeas relief on the basis of his Fourth Amendment claim, Davila must demonstrate that there was some sort of "disruption or obstruction" rising to the level of an "unconscionable breakdown" of state procedure.  Capellan, 975 F.2d at 70 (quoting Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)).

      The Second Circuit has instructed that the focus of the "unconscionable breakdown" inquiry is on the adequacy of the "corrective procedures themselves," rather than the "correctness of the outcome" resulting from the application of those procedures. Capellan, 975 F.2d at 71 (emphasis in original).  A habeas petitioner thus cannot obtain review of a Fourth Amendment claim simply because a federal court disagrees with the state court's application of state procedural rules.  Id.

      In this case, Justice Wetzel held a lengthy suppression hearing at which Davila's counsel was able to present evidence and cross-examine the People's witnesses. Indeed, following that hearing, Davila succeeded in his effort to suppress at least some of

the evidence seized following his arrest.  Accordingly, even if Justice Wetzel resolved a

portion of Davila's suppression motion incorrectly, there has been no "unconscionable

breakdown" with respect to the underlying process.  This Court consequently cannot

consider Davila's Fourth Amendment claims.  Moreover, even if his claim concerning the

cocaine seized from his vehicle were justiciable, it likely would fail.  See California v.

Acevedo, 500 U.S. 565 (1991) (holding that the police may conduct a warrantless search

of a container in the trunk of a car if they have probable cause to believe that it holds

contraband or evidence); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("[O]ne

of the specifically established exceptions to the requirements of both a warrant and

probable cause is a search that is conducted pursuant to consent.").

       Davila also claims that his Fourth Amendment rights were violated when

the trial court permitted the prosecutor to question him about the cocaine recovered from

his home, which previously had been suppressed as the fruit of an unlawful search.  As

noted previously, this claim is unexhausted and therefore does not warrant habeas review.

Nevertheless, even if this claim were to be reviewed, it would have to be rejected as

meritless.

       It is well-established that a habeas petitioner may not obtain relief merely

by showing that a state court's evidentiary ruling was erroneous under state law.  See

Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Rather, to warrant habeas relief, an

evidentiary ruling must have been "so pervasive as to have denied [the petitioner] a

fundamentally fair trial."  Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985).  "The first

43

step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule could not be unconstitutional." King v. Greiner, No. 02 Civ. 5810 (DLC) (AJP), 2008 WL 4410109, at *38 (S.D.N.Y. Sept. 26, 2008).

In this case, Davila has failed to show error under state evidentiary rules, much less constitutional error. The trial court permitted the prosecutor to cross-examine Davila about the drugs found in his home, but only after Davila testified on direct examination that he was not a drug dealer and never previously had seen the containers of cocaine that were found in the trunk of his vehicle. (T. 453, 460-61, 463, 465-67, 495-97, 499). Although Justice Wetzel previously had suppressed any evidence regarding the drugs recovered from Davila's home, Davila opened the door to this line of questioning. The trial court therefore did not err by allowing the prosecutor to pursue it. See Harris v. New York, 401 U.S. 222, 225 (1971) (trustworthy evidence inadmissible on the prosecution's direct case may be used to cross-examine defendant who opens the door because the right to testify "cannot be construed to include the right to commit perjury"); United States v. Payton, 159 F.3d 49, 58 (2d Cir. 1998) ("A defendant has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him."). Davila thus cannot show that this evidentiary ruling was erroneous, much less that it denied him a fundamentally fair trial.

6.    Counsel's Alleged Failure to
      Discuss the People's Plea Offer

Finally, Davila maintains that Mr. Race, his original trial counsel, provided

ineffective assistance by virtue of his alleged failure to discuss the People's "highly

favorable" plea offer adequately with Davila.  (Am. Pet. ¶ 13).  Davila first raised this

claim in his post-trial CPL § 440.10 motion, which Justice Fitzgerald denied after an

evidentiary hearing.

The Supreme Court has long held that "the negotiation of a plea bargain is a

critical phase of litigation for purposes of the Sixth Amendment right to effective

assistance of counsel."  Padilla v. Kentucky, 559 U.S. 356, 373 (2010) (citing Hill v.

Lockhart, 474 U.S. 52, 57 (1985)).  Challenges to guilty pleas based on ineffective

assistance of counsel thus are governed by the two-prong test laid out in Strickland v.

Washington, 466 U.S. at 668.  Hill, 474 U.S. at 57.  A petitioner raising an ineffective

assistance of counsel claim related to a guilty plea therefore must show that (a) his

counsel's performance "fell below an objective standard of reasonableness" and (b) there

is a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  Strickland, 466 U.S. at 688, 694.

"[A]s a general rule, defense counsel has the duty to communicate formal

offers from the prosecution to accept a plea on terms and conditions that may be

favorable to the accused."  Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012).  Indeed, in

this Circuit, a defense lawyer must always communicate the terms of a plea offer to a

defendant.  See Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003); Cullen v.

United States, 194 F.3d 401, 404 (2d Cir. 1999).  Defense counsel also must discuss with

their clients the pros and cons of pleading guilty.  See Purdy v. United States, 208 F.3d

41, 45-46 (2d Cir. 1998) (acknowledging that defense counsel often must chart a difficult

course "between the Scylla of inadequate advice and the Charybdis of coercing a plea");

Boria v. Keane, 99 F.3d 492, 496 (2d Cir. 1996) (observing that defense counsel's "duty

to advise his client fully on whether a particular plea to a charge appears to be desirable"

is "so well understood by lawyers practicing in this Circuit that the question has never

been litigated").

      Here, Justice Fitzgerald held an evidentiary hearing regarding Davila's

ineffectiveness claim.  At the conclusion of that hearing, the Justice found that Mr. Race

did, in fact, convey the People's plea offer to Davila and urge him to accept it.  (F. 7).

Justice Fitzgerald further found that even if Mr. Race failed to make the plea offer known

to his client, Davila was unlikely to have embraced it, given that he continued to maintain

his own innocence.  (Id. at 11-13).

      To prevail on his ineffectiveness claim, Davila must show that Justice

Fitzgerald's findings concerning the adequacy of the advice he received constituted an

unreasonable application of law clearly established by the Supreme Court or an

unreasonable determination of the facts in light of the evidence presented during the state

court hearing.  28 U.S.C. § 2254(d)(1), (e)(1).  In his papers, Davila has done neither.

Consequently, his ineffective assistance of counsel claim must be rejected.

III.    Conclusion

For the foregoing reasons, the Court should deny the Petition. Additionally, because Davila has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

IV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Swain. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

Dated:      New York, New York
            December 30, 2014

                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge

47

Copies to:

German Rios Davila          (via U.S. Mail)
DIN No. 03-A-3078
Green Haven Correctional Facility
Post Office Box 4000
Stormville, New York 12582-4000

Ashlyn Dannelly              (via ECF)
Leilani Rodriguez
Assistant Attorneys General
Office of the Attorney General
    of the State of New York
120 Broadway, 12th floor
New York, New York 10271